**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LARRY TRENT ROBERTS,** | : | |
| **Plaintiff** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 21-** |
| | : | |
| **DETECTIVE DAVID LAU and ASSISTANT** | : | |
| **DISTRICT ATTORNEY JOHN BAER and** | : | |
| **CITY OF HARRISBURG** | : | |
| **Defendants.** | : | |
| | : | **Jury Trial Demanded** |
| | : | |
| | : | |

**CIVIL ACTION COMPLAINT**

**NOW COMES** Larry Trent Roberts, by and through counsel Arthur Larkin, Esquire of Hale & Monico, and Mark V. Maguire, Esquire, and John J. Coyle, Esquire of McEldrew, Young, Purtell & Merritt complaining of Defendants, Detective David Lau, Assistant District Attorney John Baer, and the City of Harrisburg. In support thereof, Plaintiff avers as follows:

**NATURE OF THE COMPLAINT**

1. Larry Trent Roberts is a lifelong resident of Harrisburg Pennsylvania, a father, provider, and a business owner who was unjustly targeted, arrested, and convicted for a crime he did not commit. As a result, Mr. Roberts was sentenced to life in prison without the possibility of parole and suffered in a maximum-security prison for 13 years.

2. This miscarriage of justice was directly caused by the unconstitutional and unconscionable misconduct of Harrisburg Police Detective David Lau and Assistant District Attorney John Baer, as well as the customs and policies of the Harrisburg Police Department.

3. Detective Lau and ADA Baer fabricated evidence, withheld evidence, misrepresented evidence, and disregarded evidence in order to attain a conviction despite Mr. Roberts' innocence.

4. Mr. Roberts now brings this matter before the court seeking damages for the tragic and devastating loss of liberty he has suffered.

## JURISDICTION AND VENUE

5. Jurisdiction exists in this Court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of Plaintiff's rights secured by the United States Constitution.

6. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to adjudicate pendent state law claims.

7. Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b) in that the claims at issue arose in this District.

## JURY DEMAND

8. Plaintiff demands a jury on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the United States Constitution and Federal Rule of Civil Procedure 38(b)

**PARTIES**

9.  Plaintiff Larry Trent Roberts is, and at all times relevant to this Complaint was, a resident of the State of Pennsylvania. On November 14, 2007, Mr. Roberts was wrongfully convicted of the murder Duwan Stern and sentenced to life in prison without the possibility of parole. Mr. Roberts suffered in prison for 13 years until he was ultimately acquitted of all crimes on September 17, 2019.

10. Defendant Detective David Lau, at all times relevant to this Complaint was an officer of the Harrisburg Police Department acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and practices of the City of Harrisburg and the Harrisburg Police Department.

11. Defendant City of Harrisburg is, and at all times relevant to this Complaint, was a municipality located in the Commonwealth of Pennsylvania. The City of Harrisburg is, and at all times relevant to this Complaint, was officially responsible for the policies, customs, and practices of the Harrisburg Police Department. The City of Harrisburg was at all times relevant to this Complaint the employer of Defendant Detective David Lau.

12. Defendant Assistant District Attorney, at all times relevant to this Complaint was an Assistant District Attorney in the Dauphin County District Attorney's Office acting under color of law and within the scope of his employment.

## OPERATIVE FACTS

### The Murder of Duwan Stern

13. Duwan Stern was shot and killed at 20th and Swatara Streets in Harrisburg, Pennsylvania on December 21, 2005 at approximately 10:00 p.m.

14. Mr. Stern had spent the majority of the day with a girlfriend named Denise Warden. At approximately 9:00-9:30 p.m., while at Ms. Warden's house, Mr. Stern received a few phone calls and left her home. He would never return.

15. While sitting in the driver's seat of his car on 20th street, Mr. Stern was shot in the head. The sounds of the gunshots and the squealing tires, spinning interminably on the ice, drew the attention of many in the area.

16. There are no eyewitnesses to Mr. Stern's murder but there are two residents from the neighborhood, Jackie Wright and Lisa Starr, who witnessed the aftermath.

17. Ms. Wright and Ms. Stern described seeing two men leaning into Mr. Stern's car from the passenger door and pushing his dead body out onto the street.

18. One of those men was Thomas Mullen. He eventually admitted to not only pushing Mr. Stern into the street but also to rummaging through his car for drugs.

19. The other man is unknown. Ms. Wright, Ms. Starr, and Mr. Mullen all gave statements on the night of the murder that there was a second man. Their descriptions of the man varied substantially but they all agreed that he was a black male wearing a hood.

20. While Mr. Stern was being murdered and robbed by Mr. Mullen and an unknown

man, Mr. Roberts was miles away shopping with his loved ones.

21. Mr. Roberts' location is established and corroborated not just by his own statements and the testimony of his girlfriend Tyisha Williams, but also by cell phone data and a receipt from the store where he was shopping.

22. At approximately 9:30 on that night, Tony Ebersole and Tom Mullen arrived 20th and Swatara Streets to buy illicit drugs from a man named "Los". Mr. Ebersole had arranged to meet with Los alone, so he dropped Mr. Mullen off at an alley on 20th Street prior to reaching the intersection with Swatara Street.

23. Mr. Ebersole sat in his vehicle waiting for Los for approximately 25 minutes when Mr. Mullen approached the vehicle and asked him if he wanted to buy drugs from someone that Mr. Mullen knew as opposed to continuing to wait for Los.

24. Mr. Ebersole declined and told Mr. Mullen to return to the alley because Los was expecting him to be alone and would not sell him drugs if Mr. Mullen was present.

25. Approximately 30 to sixty seconds later Mr. Stern was shot and killed as he sat in his driver's seat.

26. Mr. Mullen and another unknown black male then pushed Mr. Stern's lifeless body out of the car and into the street.

27. Mr. Mullen then attempted to rob Mr. Stern of drugs or money.

28. Mr. Ebersole heard gunshots coming from the area where Mr. Mullen was walking. Mr. Ebersole claims that he looked in the direction of the gunshots, but he did not see anything.

29. Mr. Mullen returned to Mr. Ebersole's vehicle moments later and told him that his

boy- Mr. Stern- had been shot.

30. Physical evidence corroborates that Mr. Stern was shot and killed while sitting in

the driver's seat of his vehicle and that his body was pushed out of the vehicle into

the street.


**Initial Descriptions and Identifications**

31. Multiple witnesses provided statements to police in the aftermath of the murder of

Mr. Stern. None of the witnesses initially identified Mr. Roberts as the person

involved in the shooting.

    **a. Thomas Mullen**

32. Mr. Mullen was in the area of 20th and Swatara Streets to attain drugs at the time of

Mr. Stern's murder. He admits to pushing Mr. Stern's dead body out a car and

attempting to rob him. Throughout the investigation and prosecution of Mr.

Roberts, Mr. Mullen gave several statements, evolving at every turn to aid

Detective Lau and benefit himself.

33. In Mr. Mullen's first statement to police, given to Detective Lau at approximately

3:33 am on December 22, 2005, he stated as follows:

    a.  At approximately 9:30 on that night, Tony Ebersole and Tom Mullen

        arrived 20th and Swatara Streets to buy illicit drugs from a man named

        "Los". Mr. Ebersole had arranged to meet with Los alone, so he dropped

Mr. Mullen off at an alley on 20th street prior to reaching the intersection with Swatara Street.

b.  While waiting, Mr. Stern drove up and asked him if he wanted to buy drugs from him.

c.  Mr. Mullen went to ask Mr. Ebersole if he wanted to buy drugs from Mr. Stern. Mr. Ebersole declined and Mr. Mullen began walking back to Mr. Stern to decline his offer.

d.  While he was talking to Mr. Ebersole, he heard gunshots coming from the area of Mr. Stern's car.

e.  He then walked towards Mr. Stern's car and when he arrived he saw that Mr. Stern had been shot.

f.  While at Mr. Stern's car, he had a brief conversation with an armed man about what happened to Mr. Stern then left to go back to Mr. Ebersole's car.

34. Mr. Mullen would change the facts of this self-serving statement over the course of Mr. Roberts' prosecution, but it provided the starting point of Detective Lau's investigation.

35.  Mr. Mullen described the armed man he spoke with as being in his 20s, having a medium to dark complexion, 5'8" to 5'10" weighing 160-175 lbs. wearing a dark colored hoodie jacket possibly with white fringe that looked like fur.

36. Based upon Mr. Mullen's statement, Detective Lau created a photo array that included a known drug dealer named Carlos "Los" Torres in an attempt to determine whether Los was the armed man that Mr. Mullen spoke with at Mr. Stern's car.

37. In compiling this photo array, Detective Lau included a photo of Mr. Roberts.

**Creation of Suggestive Photo Array**

38. There was no valid reason to include Mr. Roberts in this photo array.

39. Detective Lau included a photo of Mr. Roberts because Detective Lau had a personal negative history with Mr. Roberts and baselessly believed that Mr. Roberts was a criminal capable of murder.

40. Specifically, Detective Lau arrested Mr. Roberts in 1994. During the course of the arrest Detective Lau assaulted Mr. Roberts by striking him with his firearm. Mr. Roberts had to be taken to the hospital after this assault.

41. In order to justify his assault of Mr. Roberts, Detective Lau accused and charged Mr. Roberts with assault.

42. The charges against Mr. Roberts were eventually dismissed by the court.

43. Detective Lau included a photo of Mr. Roberts because he saw that Mr. Roberts called Mr. Stern's phone while Lau was at the crime scene and saw an opportunity to drag Mr. Roberts into his investigation.

44. Specifically, Detective Lau was on the crime scene from at least 11:03 p.m. through 11:47 p.m., during which time he was in close proximity to Mr. Stern and Mr. Stern's cell phone.

45. Mr. Roberts called Mr. Stern's phone 3 times between 11:03 and 11:47.

46. Upon information and belief, Detective Lau either saw Mr. Roberts' name or phone number come up on Mr. Stern's phone as the incoming calls hit his phone.

47. Immediately upon learning that Mr. Roberts was an associate of Mr. Stern, he decided to drag Mr. Roberts into the investigation by including him in a photo array.

48. The baselessness of Detective Lau's inclusion of Mr. Roberts in the photo array is confirmed by the disparity of his physical appearance and Mr. Mullen's description of the armed man. Mr. Mullen claimed the man weighed 160-175 pounds while it is undisputed that Mr. Roberts weighed 287 pounds.

49. Mr. Mullen was shown the photo array and asked if he could identify the armed man he had encountered at Mr. Stern's car.

50. Mr. Mullen did not identify Mr. Roberts as the armed man he had encountered at Mr. Stern's car.

   **b.  Jacquelyn Wright**

37. Jacquelyn Wright, a resident of the neighborhood where Mr. Stern was shot called 911 to report the shooting. Ms. Wright first stated that she did not see who shot Mr. Stern. Later in the call, she described two individuals who pushed Mr. Stern out of

---

his car as "boys" in their early 20s.

38. Ms. Wright also provided multiple statements in the early morning hours following the shooting.  During her first statement at 1:43 a.m. on December 22, 2005, Ms. Wright provided greater detail of what she had observed.

39. Ms. Wight stated that after hearing gunshots, she ran to her window, looked out the window, and saw two men near Mr. Stern's car; one was light and thin with a knit hat, the other was a black guy, taller than him, with a hood on.

40. During Ms. Wright's second statement at 2:25 a.m. on December 22, 2005, she described how these two men pushed Mr. Stern out of his vehicle after he had been shot.  Ms. Wright did not provide any further description of the black man near Mr. Stern's car.

41. That same day, Detective Lau presented his photo array to Ms. Wright. And asked her if any of the men in the photos were the black man she saw near Mr. Stern's vehicle.

42. Ms. Wright did not identify Mr. Roberts as the black man she saw near Mr. Stern's vehicle. In fact, Ms. Wright selected another person from the photo array.

   **c.  Lisa Starr**

43. Lisa Starr is also a resident of the neighborhood where Mr. Stern was shot. Ms. Starr heard the gunshots that killed Mr. Stern and ran to her window to observe what was happening.

44. On December 22, 2005 at 1:35 a.m. Ms. Starr provided a statement where she

described seeing a black man with his head in Mr. Stern's car. She described the man as wearing a white shirt, white pants, and a black jacket with a hood that looked too small for the man's large belly.

45. That same day, Detective Lau presented his photo array to Ms. Ms. Starr and asked if any of the men in the photos were the man she saw with his head in Mr. Stern's vehicle.

46. Ms. Starr did not identify Mr. Roberts.

47. On January 7, 2006, Ms. Starr was shown another photo array. On that occasion Ms. Starr identified a suspect other than Mr. Roberts as "favoring" the man who she saw with his head in Mr. Stern's vehicle but stopped short of making a positive identification.

**Investigation Prior to Arrest**

48. Between the Murder of Mr. Stern on December 21, 2005 and Detective Lau's submission of his Affidavit of Probable Cause on January 12, 2006, Detective Lau had not uncovered any evidence that implicated Mr. Roberts as the man who killed Mr. Stern.

49. To the contrary, Detective Lau uncovered critical evidence that exculpated Mr. Roberts, but he disregarded and withheld that evidence in his rush to see Mr. Roberts unjustly convicted.

    a.   On December 23, 2005, Detective Lau received information that two men

named James Cousin and Fred Jackson were heard bragging about having killed Mr. Stern. Detective Lau did not compile and present photo arrays of these men to Ms. Wright, Ms. Starr, or Mr. Mullen.

b. On January 5, 2006, Mr. Stern's girlfriend Denise Warden provided Detective Lau with the identity of a suspect, "Chase", who had a violent record and a motive to harm Mr. Stern. Detective Lau showed a photo array of "Chase" to Ms. Starr who said he "favored" the person who killed Stern. Detective Lau did not show the photo array to any other witnesses.

c. By January 10, 2006, Detective Lau had obtained Mr. Roberts' cell phone records and learned that his cell provider would be able to track his location to within 1-3 miles. Rather than attaining this tracking information for its evidentiary value, Detective Lau told the cell provider to disregard the inquiry.

d. On January 11, 2006, Detective Lau received the phone number of the caller who called Mr. Stern multiple times in the hour before the murder that caused Mr. Stern to leave Ms. Warden's house. Detective Lau did nothing to investigate this information or determine the identity of the caller.

50. Rather than following the evidence to determine the true killer of Mr. Stern, Detective Lau doubled down on his unjustified determination to convict Mr. Roberts.

51. Despite a total lack of reliable evidence that implicated Mr. Roberts in this crime,

Detective Lau took extraordinary steps to focus the investigation on him.

52. On January 12, 2006, Detective Lau took Mr. Roberts into custody under the pretense that he was addressing a separate legal matter.

53. Detective Lau lied to Mr. Roberts regarding why he had taken him into custody and asked him about multiple unrelated crimes that had occurred throughout Harrisburg.

54. Detective Lau then informed Mr. Roberts that there were eyewitnesses to the aftermath of Mr. Stern's shooting who would be able to identify the shooter and requested that Mr. Roberts allow them to view him "one on one".

55. Mr. Roberts, being confident of his innocence and unaware of the fundamentally coercive and unreliable nature of the viewing process he was being asked to engage in, agreed.

56. Detective Lau then brought Ms. Wright to the police station to view Mr. Roberts for purposes of identification.

57. Detective Lau knew that this viewing was coercive and unreliable, but he proceeded because he was determined to convict Mr. Roberts of a crime he had not committed.

58. The viewing of Mr. Roberts by Ms. Wright was flawed, coercive, unreliable, unconstitutional, and designed not to find the true killer of Mr. Stern but rather to assure that Mr. Roberts would be prosecuted. This is supported by the following defects:

a.  There was no basis or justification to not follow standard lineup procedures that are designed to minimize false identifications.

b.  Ms. Wright had previously been shown a photo of Mr. Roberts and she was unable to identify him.

c.  Ms. Wright stated on January 10, 2006 that with the time that had passed she would not be able to identify the person she saw on December 21, 2005.

d.  Ms. Wright was aware that she had been shown a photo of Mr. Roberts previously and was therefore aware he was the target of Detective Lau's investigation.

e.  Detective Lau initiated the process by requesting that Ms. Wright come down to make an ID.

f.  Ms. Wright viewed Mr. Roberts while he was in an interrogation room with a uniformed police officer.

g.  The uniformed officer compelled Mr. Roberts to turn his head from right to left as if his mug shot were being taken.

h.  Ms. Wright believe that she would not be able to leave the police station unless she participated in this viewing.

i.  Ms. Wright believed Detective Lau wanted her to positively identify Mr. Roberts as the man who killed Mr. Stern.

59. Through this litany of deceptive conduct and coercive procedure, Detective Lau achieved his objective of Ms. Wright identifying Mr. Roberts as the man she saw

near Mr. Sterns' car on December 21, 2005.

**Affidavit of Probable Cause**

60. The next step in Detective Lau's scheme to prosecute Mr. Roberts for a crime he didn't commit was to draft an intentionally deceptive Affidavit of Probable Cause that was sparse on facts but riddled with fabrications and reckless omissions.

61. Detective Lau's Affidavit of Probable Cause contained the following fabrication:

    a. "Mullen and Wright both provided a consistent physical description of the suspect"

        i. Mr. Mullen described a man weighing 160-175 pounds.

        ii. Ms. Wright described seeing two "young boys."

        iii. Whereas, Mr. Roberts was a 35-year-old man weighing 287 pounds.

62. Detective Lau's Affidavit of Probable Cause contained the following reckless omissions:

    a. James Cousin and Fred Jackson had bragged about killing Mr. Stern.

    b. Mr. Mullen was shown a photo of Mr. Roberts and did not identify him.

    c. Ms. Wright was shown a photo of Mr. Roberts and did not identify him.

    d. Ms. Starr was shown a photo of Mr. Roberts and did not identify him.

    e. Ms. Starr identified another man as "favoring" the person she saw at the scene.

    f. Ms. Wright's identification of Mr. Roberts occurred under extremely

coercive conditions and was not reliable.

    g.  Detective Lau had a history of personal animus against Mr. Roberts.

63. The omission of the circumstances of Ms. Wright's identification is of critical importance because it was inconsistent with all other attempts at identification and because there was a total lack of physical or circumstantial evidence that implicated Mr. Roberts.

**Lack of Policy or Training**

64. The City of Harrisburg Police Department did not have a policy which instructs detectives that relevant information must be included in affidavits of probable cause, even if it is exculpatory.

65. The City of Harrisburg Police Department did not provide detectives any training regarding the obligation of detectives to include relevant information in affidavits of probable cause, even if it is exculpatory.

66. The City of Harrisburg did not conduct any audits to determine whether its detectives are complying with their duty to include relevant information in affidavits of probable cause, even if it is exculpatory.

**Fabrication of Evidence Post Arrest**

67. After seeing Mr. Roberts was arrested through means of an affidavit with falsified and withheld evidence, Detective Lau compounded injustice by intentionally conforming evidence to his goal of convicting Mr. Roberts of a crime he did not

commit.

a. **Thomas Mullen**

68. On January 20, 2006 Detective Lau met again with Mr. Mullen.

69. Mr. Mullen was in custody at the time and facing charges related to his involvement in the killing of Mr. Stern and other criminal matters.

70. Mr. Mullen knew at the time that Mr. Roberts had been arrested for the murder of Mr. Stern and had seen Mr. Roberts in the county jail after he was arrested.

71. Mr. Mullen gave a second self-serving statement to Detective Lau wherein he stated the armed man he encountered at Mr. Stern's car on December 21, 2005, was in the photo array he viewed on December 22, 2005.

72. Detective Lau knew that this identification was not reliable because it was inconsistent with Mr. Mullen's previous description of the armed man, because he was unable to identify Mr. Roberts prior to Mr. Roberts' arrest, and because he knew that the identification was made in pursuit of self-preservation.

73. Mr. Mullen changed his story and gave a third self-serving statement on February 22, 2006, when he admitted that he had pushed Mr. Stern out of his vehicle and searched for drugs after an armed man shot him.

74. Despite the inherent unreliability of these self-serving and contradictory statements, Detective Lau was more than willing to use Mr. Mullen for the purpose of seeing that Mr. Roberts was convicted.

75. Despite the fact that Mr. Mullen was the only person positively identified as being

in the area when Mr. Stern was shot, and the fact that Mr. Mullen lied repeatedly to minimize his criminal culpability, and the fact that he believed charges would be dropped if he testified against Mr. Roberts, he was utilized to testify against Mr. Roberts.

76. Detective Lau was the driving force in fabricating Mr. Mullen's self-serving identification of Mr. Roberts.

77. Detective Lau met and spoke with Mr. Mullen prior to him giving a statement on January 20, 2006 and intentionally influenced his testimony.

78. Detective Lau knew that Mr. Mullen's identification of Mr. Roberts was false, but he submitted it as part of his investigation for the purpose of convicting Mr. Roberts of a crime he did not commit.

79. Mr. Mullen was the sole witness at Mr. Roberts' preliminary hearing on March 13, 2006, and the court found that the prosecution had made out a prima facia case based on his self-serving fabricated identification.

80. Following the preliminary hearing and heading toward trial, the investigation had not produced any inculpatory evidence except inherently unreliable witness testimony. There was no physical evidence, circumstantial evidence, and no evidence of motive.

**b.    Tyrone Gibson**

81. Detective Lau then threatened an associate of Mr. Roberts, Tyrone Gibson, in order to fabricate a motive for Mr. Stern's murder.

82. Detective Lau fabricated a conflict between Mr. Roberts and Mr. Stern related to the sale of a car and threatened Mr. Gibson if he did not adopt this fabricated narrative.

83. It was only after it became clear to Detective Lau that Mr. Gibson did not intend to cooperate in his scheme to present fabricated evidence that Detective Lau abandoned the "car conflict" motive, that he began to conspire with ADA Baer to use Layton Potter to create a new motive.

### c.    Layton Potter

84. In order to fabricate evidence of motive, ADA Baer joined Detective Lau's investigation and began affirmatively seeking a jailhouse snitch who would testify as to a motive.

85. In October of 2007, nearly 2 years after the murder of Mr. Stern and just one month before trial, ADA Baer and Detective Lau's investigation led them to Layton Potter, a known jailhouse snitch.

86. ADA Baer approached Mr. Potter and asked him if he "wanted a piece" of the case against Mr. Roberts.

87. Mr. Potter did in fact want a piece of the case in order to gain favor related to hiw own pending criminal charges. Accordingly, Mr. Potter crafted a false statement for ADA Baer and Detective Lau which purported to establish motive for Mr. Roberts to kill Mr. Stern.

88. Mr. Potter fabricated a story of conflict between Mr. Roberts and Mr. Stern out of whole cloth. Specifically, he claimed that Mr. Roberts and Mr. Stern were both in

the drug business and had a dispute over unpaid drug debts.

89. The utility of this statement to ADA Baer and Detective Lau was made clear at trial when ADA Baer told the jury at trial that Mr. Potter would "help them understand how and why" the killing occurred.

90. ADA Baer and Detective Lau knew that Mr. Potter, who was convicted in 1998 of making false reports to law enforcement and was a regular crack cocaine user, lacked any credibility. Nonetheless, he was used for the purpose of convicting Mr. Roberts through false testimony.

91. Mr. Potter testified to the following facts that are objectively and undisputedly false:

    a.  Mr. Potter testified that he had known Mr. Roberts since the early 1990s when he tried to trade in his car at Mr. Roberts' car lot. However, Mr. Potter was only 10 years old in 1990 and Mr. Roberts was not living in Harrisburg during the 1990s except for one period of 9 months.

    b.  Mr. Potter claimed that Mr. Roberts expressed anger about Mr. Stern during a conversation around Halloween of 2005, but Mr. Potter was incarcerated from October 10, 2005 through November 11, 2005.

    c.  Mr. Potter claims that he spoke to Mr. Roberts and Mr. Roberts' brother on their cell phones between February 2005 and Mr. Roberts' arrest on January 12, 2006 however it is undisputed that no such calls ever occurred.

92. These objective and undisputed lies demonstrate that neither ADA Baer, nor

Detective Lau were concerned with the truth or veracity of Mr. Potter's testimony.

93. There is no longer any doubt that the remainder of Mr. Potters testimony was false. On November 4, 2013, Mr. Potter admitted that he had no knowledge of any dispute between Mr. Roberts and Mr. Stern. Rather, he was used by ADA Baer and Detective Lau to ensure a conviction.

### d. Sonya Anderson

94. On October 22, 2007, Sonya Anderson gave a statement to Detective Lau wherein she stated the following:

   a. On the night of Mr. Stern's murder, her friend Quinta Samuel received a phone call from Joseph "Chase" Baldwin who stated that he had just shot a man and asked her to go to the scene to see if the person was dead.

   b. Baldwin informed Samuel of the precise location on Swatara Street where Mr. Stern was killed.

   c. Baldwin stated that he could not go himself because he was on the run for robbing people.

95. This exculpatory statement provided by Ms. Anderson was not consistent with Detective Lau's goal of convicting Mr. Roberts.

96. Shortly after Ms. Anderson provided her statement, Detective Lau took her from her home to a police station.

97. Ms. Anderson was taken into a room with Detective Lau and currently unidentified Assistant District Attorneys where she was pressured, intimidated, lied to, and

coerced into providing a false recantation of her statement.

98. Ms. Anderson did not want to falsely recant her statement and did so only because Detective Lau "scared the life out of her" and told her to do so.

99. Ms. Anderson felt so intimidated and coerced by Detective Lau's efforts to attain a false recantation that she wanted to "plead the fifth" because she believed she was in jeopardy of being charged with a crime if she did not comply with Detective Lau.

100.    Detective Lau's coercive tactics were successful and Ms. Anderson signed a one paragraph recantation on November 11, 2007.

**Evidence of Mr. Roberts' Actual Innocence**

101.    The following facts undisputedly establish Mr. Roberts' total and actual innocence in relation to the death of Mr. Stern. All of these facts are supported by telephone records, cell tower data, and sworn statements:

   a.    On December 21, 2005, Mr. Roberts drove himself and Bilal Watts to Bernard Lyde's home to pick him up.

   b.    Mr. Roberts, Mr. Watts, and Mr. Lyde then drove to Mr. Roberts' car shop located at 1720 South Cameron Street in Harrisburg where they remained until 7:00p.m.

   c.    After closing the shop, the three men went to a Vietnamese restaurant on 29th Street where they remained for approximately forty minutes. While at

the restaurant, Mr. Roberts made and received multiple phone calls.

d.  After leaving the restaurant, Mr. Roberts dropped off Mr. Watts at his home at approximately 8:30 p.m. and then dropped off Mr. Lyde at his home at approximately 9:00 p.m.

e.  Mr. Roberts then went to his father's home at 3225 Willows Lane in Harrisburg, where Mr. Roberts was living at the time.

f.  At 9:14 p.m. Mr. Roberts spoke by phone with Danielle McCullom for approximately twenty minutes.

g.  At 9:53 p.m. and 10:08 p.m. Mr. Roberts received phone calls from a phone number belonging to Ernest and Charlene Dykes.

h.  At approximately 10:10 p.m. Mr. Roberts made a brief phone call to Liz Bradley.

i.  At 10:26 p.m. Mr. Roberts received a phone call from his daughter's mother, Tyisha Williams. She asked Mr. Roberts to take her to Target to return a comforter for their daughter. Mr. Roberts agreed.

j.  Mr. Roberts drove to pick up Ms. Williams at the Quail Run Apartments and called her at 10:34 p.m. to report that he was outside.

k.  Mr. Roberts then drove to the Target located at 5125 Jonestown Road in Harrisburg. Ms. Williams returned the comforter and received a refund directly to her credit card.

l.  Mr. Roberts and Ms. Williams then went across the street to a store called

Media Play where Mr. Roberts purchased two movies.

m. At 11:02 p.m. Mr. Roberts received a phone call from Ernest "Boobie" Frye who informed him that he was near 20th and Swatara Streets and believed that Mr. Stern had been shot and possibly killed.

n. At 11:17 Mr. Roberts called his brother, Kareem Trollinger to relay the information he had just received from Mr. Frye.

o. At 11:23 Mr. Roberts received another call from Mr. Frye who asked him to call Mr. Stern to see if he could answer in the hopes of confirming or refuting his suspicion that it was Mr. Stern who had been shot.

p. Mr. Roberts agreed and called Mr. Stern three times between 11:25 p.m. and 11:29 p.m.

q. At 11:26 p.m. Mr. Roberts called Mr. Frye back to inform him that Mr. Stern did not answer any of his calls.

r. Mr. Roberts then drove himself and Ms. Williams to her home at Quail Run Apartments.

s. At 11:33 p.m. Mr. Roberts received another call from Mr. Frye who informed Mr. Roberts that he was still at the scene of Mr. Stern's murder at 20th and Swatara Streets.

t. Following this phone call, Mr. Roberts left Ms. Williams' home and went to the scene. After confirming the tragic death of Mr. Stern and conferring briefly with Mr. Frye and another man named Robert Cooke, Mr. Roberts

drove back to his father's home at 3225 Willows Lane in Harrisburg.

   u.  Mr. Roberts remained in his father's home for the remainder of the evening.

102.    Mr. Roberts' location at the time that he made all of the above-described phone calls can be determined by identifying the cell phone tower that facilitated the call.

103.    The cell phone tower that facilitated the phone calls that Mr. Roberts received at 9:53 p.m. and 10:08 p.m. was in a location miles away from the area where Mr. Stern was murdered.

104.    It was known to Detective Lau, and stipulated to by ADA Baer, that if Mr. Roberts was in possession of his phone at the time that those calls came in, it would have been impossible for him to have killed Mr. Stern.

105.    Detective Lau did not acquire any evidence that supported a theory that someone else was in possession of Mr. Roberts' phone on December 21, 2005.

106.    Despite the overwhelming exculpatory evidence and complete lack of incriminating physical evidence, Detective Lau pushed forward in furtherance of his goal to see Mr. Roberts convicted.

## COUNT I: 42 U.S.C. § 1983 MALICIOUS PROSECUTION VIOLATION OF THE FOURTH AMENDMENT
*Detective David Lau*

107.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

108.    Detective David Lau initiated criminal proceedings against Mr. Roberts by

concealing and misrepresenting facts in his affidavit of probable cause seeking an arrest warrant.

109.    Detective David Lau initiated criminal proceedings against Mr. Roberts without probable cause and was only able to attain an arrest warrant by submitting an affidavit of probable cause that intentionally misrepresented facts, included fabricated evidence, and recklessly omitted exculpatory evidence.

110.    Detective David Lau acted maliciously against Mr. Roberts due to personal animus stemming from prior contact with Mr. Roberts.

111.    Detective David Lau acted maliciously against Mr. Roberts such that his purpose was not to see that justice was done but rather to see that Mr. Roberts was made to suffer.

112.    Detective David Lau's malice is demonstrated in the following conduct:

   a.    Knowingly creating and relying upon a false identification by conducting a coercive and unreliable identification procedure with Jacqueline Wright.

   b.    Knowingly creating and relying upon a false identification by influencing, enticing, and coercing Thomas Mullen to make a self-serving identification that contradicted previous statements.

   c.    Knowingly influencing, enticing, and coercing an inculpatory statement from Layton Potter: a jailhouse snitch, who lacked any credibility, whose statement could not be corroborated, and was only concerned with benefiting himself.

   d.    Intentionally withholding exculpatory information from his affidavit of

probable cause.

    e.   Including fabricated evidence within his affidavit of probable cause.

    f.   Failing to investigate alternative suspects including two men who bragged about committing the crime.

    g.   Intimidating and coercing Sonya Anderson to falsely recant her exculpatory statement.

113.    Mr. Roberts suffered a deprivation of his liberty by way of serving 13 years in prison for a crime he did not commit as a consequence of the legal proceedings initiated by Detective David Lau.

114.    The legal proceedings initiated by Detective Lau terminated in Mr. Roberts' favor when he was exonerated on September 17, 2019.

    **WHEREFORE**, Plaintiff demands judgment in his favor, and against all Defendants jointly and severally pursuant to 42 U.S.C. § 1983 including interest, delay damages, costs of suit, compensatory and punitive damages, and attorneys' fees under U.S.C. **§**1985 and **§**1988, and any other remedies legally appropriate.

<u>**COUNT II: 42 U.S.C. § 1983 FABRICATION OF EVIDENCE**</u>
<u>**VIOLATION OF THE FOURTEENTH AMENDMENT**</u>
*Detective David Lau and ADA John Baer*

115.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

116.    Detective David Lau fabricated evidence by way of:

    a.   Knowingly creating and relying upon a false identification by conducting a coercive and unreliable identification procedure with Jacqueline Wright.

b. Knowingly creating and relying upon a false identification by influencing, enticing, and coercing Thomas Mullen to make a self-serving identification that contradicted previous statements.

c. Knowingly influencing, enticing, and coercing an inculpatory statement from Layton Potter: a jailhouse snitch, who lacked any credibility, whose statement could not be corroborated, and was only concerned with benefiting himself.

d. Knowingly intimidating, influencing, and coercing and coercing Sonya Anderson to falsely recant her exculpatory statement.

117. ADA John Baer fabricated evidence by way of:

a. Knowingly influencing, enticing, and coercing an inculpatory statement from Layton Potter: a jailhouse snitch, who lacked any credibility, whose statement could not be corroborated, and was only concerned with benefiting himself.

118. The evidence fabricated by Detective David Lau and John Baer was used against Mr. Roberts during his criminal trial in 2007.

119. Mr. Roberts would not have been convicted but for the use of this fabricated evidence. Without it the only evidence presented was exculpatory data related to Mr. Roberts' alibi.

**WHEREFORE**, Plaintiff demands judgment in his favor, and against all Defendants jointly and severally pursuant to 42 U.S.C. § 1983 including interest, delay damages, costs of suit, compensatory and punitive damages, and attorneys' fees under U.S.C. **§**1985 and **§**1988, and any other remedies legally appropriate.

### COUNT III: 42 U.S.C. § 1983 WITHOLDING EXCULPATORY MATERIAL VIOLATION OF THE FOURTEENTH AMENDMENT
*Detective David Lau*

120.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

121.    Detective Lau withheld the following information from the prosecutor and ultimately the defense:

    a.    Failure to inform the prosecutor that there was a history of personal animus between himself and Mr. Roberts.

    b.    Failure to inform the prosecutor that he threatened Tyrone Gibson in order to attain motive evidence.

    c.    Failure to inform the prosecutor of the baseless and suggestive basis to include Mr. Roberts in a photo array.

122.    The information that Detective Lau withheld was exculpatory and impeaching.

123.    Mr. Roberts was prejudiced and did not receive a fair trial due to the withholding of this exculpatory and impeaching information.

124.    If Detective Lau had not withheld this exculpatory and impeaching information, Mr. Roberts would not have been convicted and spent 13 years in prison.

**WHEREFORE**, Plaintiff demands judgment in his favor, and against all Defendants jointly and severally pursuant to 42 U.S.C. § 1983 including interest, delay damages, costs of suit, compensatory and punitive damages, and attorneys' fees under U.S.C. **§**1985 and **§**1988, and any other remedies legally appropriate.

## COUNT IV: 42 U.S.C.  CIVIL RIGHTS CONSPIRACY
## VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS
*Detective David Lau and ADA John Baer*

125.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

126.    Detective David Lau and ADA John Baer conspired to fabricate evidence for the purpose of convicting an actually innocent man, Mr. Roberts, in violation of his 14th Amendment rights.

127.    In furtherance of the conspiracy to deprive Mr. Roberts of his 14th Amendment rights, Detective David Lau and ADA John Baer Knowingly sought out, influenced, enticed, and coerced an inculpatory statement from Layton Potter: a jailhouse snitch, who lacked any credibility, whose statement could not be corroborated, and was only concerned with benefiting himself.

128.    The period of the conspiracy extended from the time that ADA John Baer sought out Mr. Potter seeking for the purpose of fabricating a motive in the prosecution of Mr. Roberts through the entirety of the prosecution.

129.    The conspiracy deprived Mr. Roberts of his 14th Amendment rights and ultimately caused him to be deprived of his liberty for 13 years.

**WHEREFORE**, Plaintiff demands judgment in his favor, and against all Defendants jointly and severally pursuant to 42 U.S.C. § 1983 including interest, delay damages, costs of suit, compensatory and punitive damages, and attorneys' fees under U.S.C. **§**1985 and **§**1988, and any other remedies legally appropriate.

<u>**COUNT V: 42 U.S.C. § 1983 MUNICIPAL LIABILITY**</u>
*City of Harrisburg*

130.    The preceding paragraphs are incorporated by reference as though laid out fully
herein.

131.    The City of Harrisburg, by and through its policymakers operated the
Harrisburg Police Department without a policy which instructs its detectives
regarding the information which must be included within Affidavits of Probable
Cause.

132.    The City of Harrisburg, by and through its policymakers operated the
Harrisburg Police Department without any training regarding the constitutional
obligations of detectives when completing Affidavits of Probable Cause.

133.    The need for policies and training related to the creation of affidavits of probable
cause is obvious because it is a request to use state authority to deny citizens of their
liberty.

134.    The risk of constitutional violations occurring where a city maintains no policies
or training related to the creation of affidavits of probable cause is obvious and
severe.

135.    The ongoing failure the City of Harrisburg, by and through its policymakers, to
implement policies to protect the constitutional rights of its citizens constitutes
deliberate indifference.

136.    The ongoing failure of the City of Harrisburg, by and through its policymakers,
to implement policies or training related to the creation of affidavits of probable

cause was a moving force behind the deprivation of Mr. Roberts' constitutional rights.

**WHEREFORE**, Plaintiff demands judgment in his favor, and against all Defendants jointly and severally pursuant to 42 U.S.C. § 1983 including interest, delay damages, costs of suit, compensatory and punitive damages, and attorneys' fees under U.S.C. **§**1985 and **§**1988, and any other remedies legally appropriate.

## COUNT VI: STATE LAW MALICIOUS PROSECUTION
*Detective David Lau*

137.    The preceding paragraphs are incorporated by reference as though laid out fully herein.

138.    Detective David Lau initiated criminal proceedings against Mr. Roberts by concealing and misrepresenting facts in his affidavit of probable cause seeking an arrest warrant.

139.    Detective David Lau initiated criminal proceedings against Mr. Roberts without probable cause and was only able to attain an arrest warrant by submitting an affidavit of probable cause that intentionally misrepresented facts, included fabricated evidence, and recklessly omitted exculpatory evidence.

140.    Detective David Lau acted maliciously against Mr. Roberts due to personal animus stemming from prior contact with Mr. Roberts.

141.    Detective David Lau's acted maliciously against Mr. Roberts such that his purpose was not to see that justice was done but rather to see that Mr. Roberts was

made to suffer.

142.    Detective David Lau's malice is demonstrated in the following conduct:

 a.  Knowingly conducting a coercive and unreliable identification procedure with Jacqueline Wright.

 b.  Knowingly enticing an inculpatory statement from Layton Potter, a person who lacked any credibility and whose statement could not be corroborated.

 c.  Intentionally withholding exculpatory information from his affidavit of probable cause.

 d.  Including fabricated evidence within his affidavit of probable cause.

 e.  Failing to investigate alternative suspects including two men who bragged about committing the crime.

 f.  Intimidating and coercing Sonya Anderson to falsely recant her exculpatory statement.

143.    Mr. Roberts suffered a deprivation of his liberty by way of serving 13 years in prison for a crime he did not commit as a consequence of the legal proceedings initiated by Detective David Lau.

144.    The legal proceedings initiated by Detective Lau terminated in Mr. Roberts' favor when he was exonerated on September 17, 2019.

**WHEREFORE**, Plaintiff demands judgment in his favor, and against all Defendants jointly and severally including interest, delay damages, costs of suit, general and specific damages, punitive and exemplary damages as provided by law.

Respectfully submitted,

/s/ Mark V. Maguire

**MCELDREW YOUNG PURTELL MERRITT**

Mark V. Maguire, Esquire*
John J. Coyle, Esquire
S. Lee Merritt, Esquire*
123 South Broad Street
Suite 2250
Philadelphia, PA 19109
215-545-8800
mmaguire@mceldrewyoung.com
jcoyle@mceldrewyoung.com
lee@mceldrewyoung.com

*Pro hac vice petition forthcoming*

**HALE & MONICO**

Arthur Larkin, Esquire*
233 Broadway
Suite 820
New York, NY 10279
646-858-1180
alarkin@halemonico.com